# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **STEVEN MEANS,** | § | |
| | § | |
| **Plaintiff and/or Counter-Defendant,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:20-cv-03979** |
| | § | |
| **FTI CONSULTING, INC.,** *et al.*, | § | |
| | § | |
| **Defendants and/or Counter-Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **DELOITTE TRANSACTIONS AND** | § | |
| **BUSINESS ANALYTICS LLP,** | § | **JURY DEMANDED** |
| | § | |
| **Counterclaim Defendant.** | § | |

## FTI DEFENDANTS' AND COUNTERCLAIM-PLAINTIFFS' AMENDED ANSWER, COUNTERCLAIM and THIRD-PARTY COUNTERCLAIM

Defendants and Counterclaim-Plaintiffs FTI Consulting, Inc. and FTI, LLC (collectively "FTI" or "Defendants"), hereby submit this Amended Answer to Plaintiff and Counterclaim-Defendant Steven Means' Petition, as removed to this Court on November 23, 2020 (the "Petition"), *see* Defs.' Notice of Removal (Dkt. 1), Counterclaim, and Third-Party Counterclaim against Deloitte Transactions and Business Analytics LLP.

## ANSWER

Pursuant to Rule 81(c)(2) of the Federal Rules of Civil Procedure and this Court's Scheduling Order of March 5, 2021 (Dkt. 5), FTI answers the allegations of the Petition as follows:

FTI admits that Plaintiff Steven Means ("Plaintiff" or "Means") brings the lawsuit on behalf of himself against FTI.

1.     FTI denies the allegations of Paragraph 1 of the Petition.

2.      FTI admits the allegations of Paragraph 2 of the Petition.

3.      FTI admits that Means was principally employed by FTI in Harris County, Texas and denies the other allegations of Paragraph 3 of the Petition.

4.      With respect to Paragraph 4 of the Petition: FTI admits that Means entered into an Employment Agreement with FTI effective March 27, 2017. FTI admits that it is "engaged in a multifaceted array of technology and consulting services." FTI denies that "Plaintiff was employed by Defendants providing services in the forensic and litigation services arm of the company." FTI admits that a copy of the Employment Agreement is attached to the Petition as Exhibit A but denies that it is a true and correct copy of the original document.

5.      FTI denies the allegations of Paragraph 5 of the Petition.

6.      FTI denies the allegations of Paragraph 6.1[1] of the Petition.

7.      FTI denies the allegations of Paragraph 7.1[2] of the Petition but admits that paragraph 24 of the Employment Agreement states, "This Agreement shall be governed by the internal laws of the State of Maryland without regard to principles of conflicts of law. Any judicial proceeding permitted under Section 29 hereof shall be brought in a court of competent jurisdiction located in the State of Maryland, and the Company and Employee each herewith submits to the in personam jurisdiction of such court."

8.      FTI denies the allegations of Paragraph 6.2 ("Declaratory Judgment") of the Petition except that it is without sufficient information to admit or deny the allegation regarding Means' intent in filing the Petition ("In order to determine the rights …."). FTI denies all relief sought by Means in this paragraph.

---

[1] There are two Paragraphs numbered "6" in the Petition. This Answer and Counterclaim cites to the first Paragraph 6 as "Paragraph 6.1" and the second Paragraph 6 as "Paragraph 6.2" to avoid confusion.

[2] There are two Paragraphs numbered "7" in the Petition. This Answer and Counterclaim cites to the first Paragraph 7 as "Paragraph 7.1" and the second Paragraph 7 as "Paragraph 7.2" to avoid confusion.

9.      FTI incorporates its prior responses in response to this Paragraph 7.2 ("Request for Declaratory Relief") of the Petition. FTI denies the allegations of this Paragraph 7.2. FTI denies all relief sought by Means in this paragraph.

10.     With respect to Paragraph 8 ("Attorneys' Fees"), FTI denies that Means is entitled to attorney's fees or that such an award would be equitable or just. FTI is without sufficient information to admit or deny the remainder of the allegations in this paragraph relating to Means' engagement of Rosenberg & Sprovach.

11.     FTI is without sufficient information to admit or deny the allegation in Paragraph 9 regarding Means' jury demand.

12.     FTI denies Means' request for disclosures in Paragraph 10.

13.     FTI denies the allegations in Paragraph 11, including its subparagraphs, and denies that he is entitled to any of the relief sought.

### DEFENSES and AFFIRMATIVE DEFENSES

Without assuming any burden other than as required by law, FTI hereby states and provides notice of the following defenses and affirmative defenses:

14.     The Petition fails, in whole or in part, to state a claim upon which relief may be granted.

15.     The provisions of the Employment Agreement between Means and FTI are valid and enforceable pursuant to the laws of the State of Maryland or the State of Texas.

16.     By virtue of the removal of the prior state court action to federal court on the basis of diversity jurisdiction, Means' declaratory judgment action is governed by federal procedural law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Therefore, Means may not rely on the Texas declaratory judgment act to recover attorney's fees. Pursuant to the federal Declaratory

Judgment Act, attorney's fees or costs are not available. *See Camacho v. Texas Workforce Comm'n*, 445 F.3d 407, 407 (5th Cir. 2006). To the extent Means seeks recovery or remedies beyond those available under the federal Declaratory Judgment Act, such remedies are improper.

17.     Means is barred from any recovery of punitive or liquidated damages because FTI engaged in good faith efforts to comply with the law, Means cannot demonstrate any willfulness, and because Means has not pled facts sufficient to support such an award.

18.     Means' request for declaratory judgment is barred, in whole or in part, by the equitable doctrines of estoppel, unclean hands, or acquiescence.

19.     Means' request for a declaratory judgment that provisions of the Employment Agreement be declared unenforceable is barred, in whole or in part, by his prior contractual agreement and assent that any such provisions found to be unenforceable or invalid shall be replaced by a reformed valid and enforceable provision. *See* Ex. A, Employment Agreement by and between Means and FTI, dated March 27, 2017 (the "Employment Agreement"), at ¶¶ 18, 21.

20.     Means' request for declaratory judgment is barred, in whole or in part, by TEX. BUS. & COM. CODE ANN. § 15.51, which requires the reformation, as opposed to non-enforcement, of any covenants ancillary to or part of an otherwise enforceable agreement that are found to contain unreasonable or overbroad limitations as to time, geographical area, or scope of activity to be restrained.

21.     Means did not suffer any damages or injury from any of the conduct alleged in the Petition and, to the extent Means did suffer damages or injury, he failed to undertake reasonable efforts to mitigate the damage or injury.

22.     Means' Employment Agreement with FTI contains certain typographical errors which may render relevant provisions ambiguous on their face, requiring parol evidence to demonstrate the contracting parties' final meeting of the minds.

23.     Pending the conclusion of further discovery and investigation, FTI reserves the right to plead other and additional defenses that may be necessary and proper to the full defense of this action.

## **COUNTERCLAIMS**

FTI brings the following counterclaims by which it seeks actual damages, special damages including lost profits, a permanent injunction, and such other relief as it may be entitled to:

### *PARTIES*

24.     FTI, LLC is a limited liability company organized and existing under the laws of the State of Maryland and therefore a citizen of that state, with its principal place of business at 555 12th St, NW, Ste. 700, Washington, DC 20004.  It is a wholly owned subsidiary of FTI Consulting, Inc.

25.     FTI Consulting, Inc. is a corporation organized and existing under the laws of the State of Maryland and therefore a citizen of that state, with its principal place of business at 555 12th St, NW, Ste. 700, Washington, DC 20004.

26.     Steven Means is an individual resident and citizen of the state of Texas, residing in Harris County at 13715 Blair Hill Ln, Houston, TX 77044.

27.     Deloitte Transactions and Business Analytics LLP ("Deloitte") is a limited liability partnership organized under Delaware law and therefore a citizen of that state, with its headquarters in New York, New York.

## *JURISDICTION*

28.     The Court has personal jurisdiction over Means as a resident of this forum and as plaintiff in the original complaint.  *See, e.g., Burnham v. Superior Court of California, County of Marin*, 495 U.S. 604, 619 (1990).  This Court has specific personal jurisdiction over third-party counterclaim defendant Deloitte because it is registered to and does conduct business in this state, maintains facilities and personnel in Texas, and FTI's third-party counterclaim arises out of Deloitte's conduct within or purposefully directed towards this forum state.

29.     The Court has original subject matter jurisdiction over the Counterclaim and Third-Party Counterclaim under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy, excluding interest and costs, exceeds $75,000. *See* 28 U.S.C. § 1332(a).  First, Means is a resident and citizen of Texas, and therefore diverse to and from both FTI Defendants, each of whom are Maryland citizens with principal places of business in Washington, D.C. *See* Defs.' Notice of Removal, at ¶ 4 (Dkt. 1); *see also* 28 U.S.C. § 1332(c).  As a Delaware limited liability partnership with headquarters in New York, Third Party Counterclaim Defendant Deloitte is also diverse as to every other party in the case.  Second, the amount in dispute exceeds $75,000 because the parties' dispute the lawfulness of a 1-year non-competition provision of Means' FTI Employment Agreement, under which Means was making an annual salary in excess of $525,000 (USD).  *See e.g., Hellas Constr., Inc. v. Beynon Sports Surfaces, Inc.*, 2019 WL 4254307, at *5 (W.D. Tex. Sept. 6, 2019) (in actions concerning the enforcement of a non-competition provision, the amount-in-controversy requirement is met by proof of, *inter alia*, the employee's annual salary in the event the non-competition provision did not preclude them from engaging in such competitive employment); *see also* Defs.' Notice of Removal (Dkt. 1).

*VENUE*

30.     Plaintiff Means initially filed his petition in Harris County District Court.  FTI removed the Petition prior to filing its Original Answer and Counterclaim. *See* Defs.' Notice of Removal (Dkt. 1). Pursuant to 28 U.S.C. § 1446(a), FTI was required to file a notice of removal in the "district court of the United States for the district and division within which such action is pending" – the Southern District of Texas – in order to remove the Complaint.  Further, venue is proper in this judicial district as the district in which Means resides, and in which third-party counterclaim defendant Deloitte maintains an office and conducts business from which FTI's third-party counterclaims arise.  *See* Petition, at ¶ 2; *see also* 28 U.S.C. § 1391(b)(1).

*FACTUAL ALLEGATIONS*

A.     **FTI is a Consulting Firm Providing Services in Areas Including Construction Solutions and Asset Lifecycle Management.**

31.     FTI is a global business advisory firm founded in 1982, with offices in Houston, Texas and in other cities around the globe.

32.     FTI provides a diverse range of services to assist its clients across the business cycle, including in the following key segments: Corporate Finance & Restructuring, Economic Consulting, Forensic & Litigation Consulting, and Strategic Communications and Technology.

33.     Within the Forensic & Litigation Consulting segment, FTI maintains a diverse portfolio of consulting practices focused on specific industries, including Construction Solutions.

34.     FTI's Construction Solutions service focuses on providing commercial management, risk-based advisory consulting, dispute resolution services, and strategic communications counsel on complex construction projects.

**B.**   **FTI Promoted Means as Global Leader and Founder of its Asset Lifecycle Management Business Line.**

35.     On March 27, 2017, Means was hired into FTI's Construction Solutions practice as a Senior Managing Director.

36.     While working for FTI, Means has at all times been based in FTI's Houston office.

37.     Means' starting base salary with FTI was $450,000 per year, not including other compensation. *See* Ex. A, Employment Agreement, at Schedule I.

38.     By the time of Means' voluntary resignation, his annual base salary was $525,000.

39.     Means was hired to spearhead the creation of an entirely new business line – Asset Lifecycle Management ("ALM") – in FTI's Construction Solutions practice area.

40.     Means thereafter became the Global Leader of the ALM practice at FTI.

41.     The ALM business line, situated within FTI's Construction Solutions practice, advises clients on capital projects.

42.     The goal of the ALM practice is to help clients develop optimally profitable lifetime operating models for capital-intensive assets, supporting each stage of a physical asset's commercial lifespan, beginning with its funding and construction, and continuing until its sale or disposal.

43.     In establishing the ALM practice, FTI committed to Means the resources and assets necessary to establish the ALM practice, including significant capital for business development, administrative resources, contacts, marketing materials, and branding.

44.     In addition, under Means' management, FTI hired numerous individuals into full-time roles designated to build the ALM practice. George Aucamp, Tiffany LaFleur, and Leslie Gowdish were among these individuals.

45.     As Means was aware, each individual entered into an employment agreement with FTI, containing enforceable non-solicitation and non-disclosure provisions.

46.     Further, many of the initial clients of the ALM business line were pre-existing clients of other FTI business lines. Those pre-existing clients included what would become the largest client of the ALM business.

47.     After FTI's ALM practice area was established, Means became the face of the new business line, with responsibilities including product and business development, as well as the regular interaction with current and prospective clients of FTI in order to grow the ALM book of business. FTI thereby built substantial goodwill in its ALM venture, during which period Means was principally responsible for the profits and losses of the ALM business line.

48.     Throughout this time, Means accessed – and was provided access to – significant confidential information of FTI, including both valuable information not known outside of FTI and information given to FTI in trust.  The information at issue includes but is not limited to non-public client lists and information, pricing, financial data, marketing or business plans or projections, personnel information, bids, service delivery methods, and information regarding FTI's existing and future business development activities (collectively, together with the definition of Confidential Information set forth in the Employment Agreement, at ¶ 13, the "Confidential Information").

49.     FTI's Confidential Information took significant time, money, and effort for FTI to develop, and would be economically valuable to FTI's competitors.

**C.     Means Agreed to Restrictive Covenants as a Condition of His Employment and Access to FTI's Confidential Information.**

50.     Means entered into an Employment Agreement with FTI dated as of March 27, 2017 (the "Employment Agreement") as a condition of his employment with FTI.

51.     FTI would not have entrusted Means with access to its Confidential Information and allowed him to be associated with FTI's goodwill and establishment of its new ALM business line, as described herein, if he had not agreed to be bound by the restrictive covenants and nondisclosure agreement set forth in the Employment Agreement.

52.     Means' entry into the non-disclosure, non-competition and non-solicitation covenants in the Employment Agreement gave FTI assurances about the investment it was making in Means as the leader of its ALM business line and allowed FTI to protect its goodwill (including any customer or employee goodwill Means would necessarily build through his leadership position at FTI) and the Confidential Information that it would entrust to Means.

53.     Means was presented with the Employment Agreement in February 2017, prior to its execution and effective date of March 27, 2017.

54.     In entering into the Employment Agreement, Means agreed that during the "Restricted Period" he would not be employed by or engage in a "Competing Business" in the "Market Area" where such "employment would involve any level of strategic, advisory, technical, creative, sales, or other similar input".  Ex. A, Employment Agreement at ¶ 11.

55.     Within this restriction, "Competing Business" is defined to mean those "forensic and litigation consulting services (including investigation services as defined by FTI) and related lines of business actively conducted by Company in which Employee is substantially engaged during the period of Employee's employment with Company and at the time Employee's employment ends." *Id*. at ¶ 177(b).

56.     During Means' employment with FTI, he was substantially engaged in the provision of ALM services, which was a sub-practice within FTI's larger forensic and litigation consulting services practice area.

57.     "Competing Business" thus includes employment within a business providing ALM consulting services, if such "employment would involve any level of strategic, advisory, technical, creative, sales, or other similar input". *Id.* at ¶¶ 11, 177(b).

58.     "Market Area" is defined to mean the "50-mile radius of any location in which Company has an office and in which Company offers or provides forensic and litigation consulting services (including investigation services as defined by FTI) to clients in the ordinary course of its business." *Id.* at ¶ 177(c).

59.     The "Market Area" therefore includes Houston, Texas, where FTI has offices and out of which Means (and others) provided asset lifecycle management services to FTI's clients in the ordinary course of its business.

60.     The "Restricted Period" is defined, in relevant part, as one year from the date of Means' resignation without "Good Reason". *Id.* at ¶¶ 177(a), Schedule I(5).

61.     The Employment Agreement provides that this "Restricted Period" "will be extended by the amount of any and all periods that Employee violates the covenants of any of Sections 11 and 12." *Id.* at ¶ 177(a).

62.     In addition to the restriction above, Means agreed to adhere to other restrictions by entering the Employment Agreement.

63.     The Employment Agreement contains a non-disclosure provision protecting FTI's Confidential Information, including its business plans, opportunities, strategies, proposals, or any other information that is not known outside of the company and that is either of value to FTI or has been given to it in confidence by third parties. *Id.* at ¶ 13.

64.     Means acknowledged that his unauthorized use of such information would cause "substantial loss and damages that could not be readily calculated and for which no remedy at law would be adequate." *Id*.

65.     Further, the Employment Agreement contains customer, client and employee non-solicitation provisions prohibiting Means, during the Restricted Period, from: (i) soliciting business regarding the cases or matters on which Means worked while at FTI; (ii) soliciting clients of the business "in which Employee was engaged" on FTI's behalf at the time of his termination or for two years prior; or (iii) soliciting certain employees of FTI. *See id.* at ¶ 12(a)-(c). The employee non-solicitation provision prohibits Means from soliciting, inducing, or attempting to influence, *inter alia*, any employee of FTI, to leave their employment with FTI or to discontinue providing services to FTI, excluding any clerical employees or employees who have not been employed by FTI for at least one year. *See id.* at ¶ 12(c).

66.     FTI fully performed its obligations pursuant to the Employment Agreement.

67.     FTI provided Means with all agreed-upon benefits pursuant to the Employment Agreement.

68.     FTI provided Means with Confidential Information pursuant to the Employment Agreement.

**D.     Means Accepted a New Offer of Employment in Violation of the Employment Agreement.**

69.     On September 15, 2020, Means gave notice of his intent to voluntarily resign from FTI.

70.     The Employment Agreement provided that Means should give "forty-five (45) days prior written notice" of his intent to voluntarily resign. *Id.* at ¶ 9(a).

71.     Means did not provide notice of "Good Reason" for his resignation pursuant to the Employment Agreement.

72.     On October 30, 2020, Means' notice period ended, and he resigned from FTI.

73.     On September 15, 2020, the same day that Means provided FTI with notice of his resignation, Means filed his request for a declaratory judgment in state court.

74.     Means told FTI that he was resigning because he had received a more lucrative offer of employment, but he would not disclose from whom.

75.     Means did not serve his complaint on FTI until October 27, 2020.

76.     On or about November 1, 2020, Means commenced work for Deloitte, advising clients on capital projects.

77.     Deloitte's offices in Houston, Texas are within 50 miles of FTI's Houston offices.

78.     Deloitte provides consultation or advisory services for the management of capital projects.

79.     Deloitte's capital project management consulting business is a competitor to FTI's asset lifecycle management business.

80.     In his work for Deloitte, FTI understands that Means advises on capital projects with respect to matters such as good business process, enabling technology and performance improvement.

81.     Means' functions, as set forth in the foregoing paragraph, are substantially similar or the same as those that Means performed during his employment with FTI in his role as head of FTI's ALM business line.

82.     Under the terms of the Employment Agreement, Means' work as a Deloitte employee providing advice on the management of capital projects in Deloitte's Houston office

constitutes work for a Competing Business that is within the Market Area during the Restricted Period.

83.     Means' employment with Deloitte in a capital projects advisory or consulting services role constitutes a breach of the terms of the Employment Agreement.

**E.     Means Solicited Employees and Used and Disclosed Confidential Information in Violation of the Employment Agreement.**

84.     After or before Means began his employment with Deloitte, Means contacted at least three then-employees of FTI: George Aucamp, Tiffany LaFleur, and Leslie Gowdish (respectively "Aucamp," "LaFleur," and "Gowdish," and collectively, the "Solicited Employees") to encourage them to accept offers of employment within Deloitte's new capital programs business line.

85.     As a direct or indirect result of solicitation, either by Means personally or other Deloitte personnel working in active concert with Means, each Solicited Employee tendered their resignation from employment with FTI in January 2021, to assume employment with Deloitte.

86.     Each of the Solicited Employees held a position as either a director and senior director of FTI.

87.     On January 18, 2021, Means' and Deloitte's capital project consulting business launched a marketing campaign in which Means communicated with an unknown number of recipients including FTI client contacts he met while employed at FTI.  Means used or disclosed protected Confidential Information, obtained in the course and scope of his employment with FTI, in this and similar Deloitte marketing communications.

88.     Upon information and belief, based on the foregoing, since leaving FTI's employment Means has used or disclosed, and continues to use or disclose, other Confidential Information in the course of his work for Deloitte or for his own purposes.  Indeed, given his

leading at role in developing and leading FTI's global ALM business line, and his new senior management in a directly competing line of business at Deloitte, Means' use and disclosure of FTI Confidential Information at and on behalf of Deloitte is inevitable and unavoidable.

89.    Means' solicitation of the Solicited Employees and his use and disclosure of FTI's Confidential Information each constitute a breach of the terms of the Employment Agreement.

## COUNTERCLAIM CAUSES OF ACTION AGAINST MEANS

### *CAUSES OF ACTION 1–3: BREACH OF CONTRACTUAL PROVISIONS re: 1) NON-COMPETITION; 2) NON-SOLICITATION; 3) NON-DISCLOSURE*

90.    The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

91.    The Employment Agreement is supported by consideration from FTI including (but not limited to) Means' employment by FTI as a senior manager, substantial compensation thereunder, and his access to and FTI's provision of Confidential Information.

92.    In the Employment Agreement, Means agreed not to disclose or publish to any person or otherwise use Confidential Information that he became aware of because of his association with the company in an unauthorized or improper manner, or in any manner that is or may reasonably be likely to be detrimental to FTI's business. *See* Ex. A, Employment Agreement, at ¶ 13.

93.    "Confidential Information" in the Employment Agreement is defined to include information not generally known outside of FTI that may be of value to FTI or that have been given to FTI in confidence by third parties. This includes, without limitation, information regarding FTI's "present or future business, operations, services, products, research, inventions, discoveries, drawings, designs, plans, processes, models, technical information, facilities, methods, trade secrets, copyrights, software, source code, systems, patents, procedures, manuals,

specifications, any other intellectual property, confidential reports, price lists, pricing formulas, customer lists, financial information, business plans, lease structure, projections, prospects, or opportunities or strategies, acquisitions or mergers, advertising or promotions, personnel matters, legal matters, proposals, response to any request for proposal, any other confidential and proprietary information, and any other information not generally known outside Company that may be of value to Company," excluding any information already properly in the public domain (further defined in the Employment Agreement). *Id*. "Confidential Information" also includes "confidential and proprietary information and trade secrets that third parties entrust to FTI or Company in confidence." *Id.*

94.     The Employment Agreement further contains customer, client and employee non-solicitation provisions prohibiting Means, during the "Restricted Period", from, on his own behalf or on behalf of any other individual or entity, intentionally: (i) "solicit[ing] business regarding any case or matter upon which Employee worked on behalf of the Company during the term of this Agreement"; (ii) "solicit[ing] any person or entity who is a client of the Company's business in which Employee was engaged at the time of or at any time within a twenty-four (24) month period of time immediately prior to the termination of Employee's employment with the Company"; or (iii) "solicit[ing], induc[ing] or otherwise attempt[ing] to influence any person who the Company employs or otherwise engages to perform services . . . to leave the employ of or discontinue providing services to the Company, provided, however, that this restriction will not apply in the case of any clerical employee of the Company or in the case of any other employee whose employment with the Company has been terminated for at least one (1) year." *See id.* at ¶ 12(a)-(c).

95. Means also agreed therein not to compete with FTI, during the "Restricted Period" by being employed for a "Competing Business" in the "Market Area" where such "employment would involve any level of strategic, advisory, technical, creative, sales, or other similar input". *See id.* at ¶ 11.

96. Means agreed therein that violations of any of Sections 11 and 12 of the Employment Agreement would extend the "Restricted Period" by an amount of time equal to that of the violations. *See id.* at ¶ 177(a).

97. Under the Employment Agreement, "Restricted Period" is defined as one year following a resignation without "Good Reason". *Id.* at ¶¶ 177(a), Schedule I(5).

98. "Market Area" is defined to mean the "50 mile radius of any location in which Company has an office and in which Company offers or provides forensic and litigation consulting services (including investigation services as defined by FTI) to clients in the ordinary course of its business." *Id.* at ¶¶ 11, 177(c).

99. "Competing Business" is defined to mean those "forensic and litigation consulting services (including investigation services as defined by FTI) and related lines of business actively conducted by Company in which Employee is substantially engaged during the period of Employee's employment with Company and at the time Employee's employment ends." *Id.* at ¶ 177(b) (defining Competing Business). "Company" is defined to mean FTI, LLC, FTI Consulting, Inc., and all of their respective subsidiaries, affiliates and entities. *Id.* at 1 (recitations). "Employee" is defined to mean Steven Means. *Id.* at 1 (recitations), Schedule I.

100. Means resigned without Good Reason from FTI on October 30, 2020.

101. During Means' employment with FTI, and at the time of his resignation, Means was substantially engaged in FTI's ALM practice.

102.    FTI's ALM business line is a related line of business to its forensic and litigation consulting services.

103.    "Competing Business" thus includes employment within a business providing capital asset management consulting services, if such "employment would involve any level of strategic, advisory, technical, creative, sales, or other similar input". *Id*. at ¶¶ 11, 177(b).

104.    FTI maintains offices in Houston, Texas, out of which it offers and provides forensic and litigation consulting services, including ALM services, to its clients in the ordinary course of its business.

105.    Therefore, the Employment Agreement prohibits Means from being employed in a consulting role providing advice on the management of capital projects anywhere within 50 miles of FTI's Houston offices – and any other FTI office offering similar services – until one year after Means' discharge date or the cessation of any breaching activity, whichever occurs later.  *Id.* at ¶¶ 11, 17.

106.    Means' current employment with Deloitte, in which he provides consulting services for capital projects out of Deloitte's Houston office, violates the terms of the non-competition restriction in the Employment Agreement.

107.    During the same period, the Employment Agreement also restricts Means from soliciting, inducing, or attempting to influence any employee of FTI to leave FTI's employ (excluding clerical employees and individuals who have not been employed by FTI for at least one year). *Id.* at ¶ 12(c).

108.    Means agreed these restrictions' duration will be extended by the amount of any and all periods that Means is in breach of the restriction. *See id.* at ¶ 177(a).

109.    These restrictions do not impose a greater restraint than is reasonably necessary to protect FTI's goodwill and other business interests given both Means' role as the Global Leader for FTI's ALM practice area, his intimate knowledge of sensitive Confidential Information regarding FTI's business, and the substantial compensation and other consideration that FTI paid to Means in exchange for his contractual promises.

110.    Means' solicitation of Aucamp, LaFleur, and Gowdish, each of whom were non-clerical employees of FTI until their resignations in January 2021, violated the terms of the employee non-solicitation restriction in the Employment Agreement.

111.    Means' prior or ongoing use and disclosure of Confidential Information on behalf of Deloitte – or to any third party other than FTI – violates the terms of the non-disclosure provisions in the Employment Agreement.

112.    Therefore, Means has breached, and continues to breach, the Employment Agreement.

113.    Means' breach of his Employment Agreement has proximately caused, and is likely to continue causing, harm to FTI including but not limited to actual damages, lost profits, loss of value of the ALM business, and loss of goodwill.  Such injuries include without limitation FTI's lost value in the ALM business and its goodwill, loss of value to the Confidential Information, loss of customer relationships, the forecasted business that would have been generated by the Solicited Employees had Means not solicited them, and costs of replacement associated with the positions left vacant by the Solicited Employees.

114.    As a direct and proximate cause of Means' breach of the Employment Agreement, FTI will also suffer injury for which there is no adequate remedy at law, and for which the damages are continuing and incapable of exact proof, including damage to FTI's business and goodwill; an

incalculable amount of business that has been or may be lost as a result of Means' competition; the loss of competitive advantage and customer goodwill; and the potential loss of customers and business.

115.     The injury posed by Means' current and threatened breaches of the Employment Agreement outweighs any damage that an injunction enjoining such breaches, if entered, may cause Means.

116.     An injunction enjoining Means from breaching the Employment Agreement would not disserve the public interest.

117.     Accordingly, FTI seeks injunctive relief permanently restraining Means' breaches of the Employment Agreement and ordering that the Restricted Period of the non-competition and non-solicitation provisions shall be extended by a period of time equal to the period in which Means violated the covenants of the Employment Agreement, as well as ordering such other legal and equitable relief to which FTI may be entitled, including costs, pre- and post- judgment interest as allowed by law.

118.     In the alternative, in the event the Court finds that certain covenants in the Employment Agreement are not enforceable in any respect as drafted, or are found to be ambiguous, FTI requests that the Court reform the provisions at issue pursuant to Section 18 of the Employment Agreement, or as otherwise may be permitted by applicable law, and then enforce such reformed provisions through injunctive relief permanently restraining Means' breach of such reformed provisions.

119.     All conditions precedent to FTI bringing its claim for breach of contract have been performed or have occurred.

### *CAUSE OF ACTION 4: BREACH OF FIDUCIARY DUTY*

120.     The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

121.     Throughout his employment at FTI as a Senior Director and as Global Leader of its ALM Practice, Means owed FTI a common law fiduciary duty and duty of loyalty including, but not limited to, a duty to act in FTI's best interests and not take actions on matters for which Means had a conflict of interest with FTI.  Means also has an ongoing duty to maintain and not disclose FTI Confidential Information.

122.     Means received FTI's Confidential Information as a part of his employment at FTI and knew that the information should not be disclosed to the public, to FTI's competitors, or to any third party.

123.     Means breached this duty by using or disclosing FTI's Confidential Information on behalf of Deloitte or himself, or in the course of his work for Deloitte.

124.     Means' and Deloitte's use of FTI Confidential Information has caused and is likely to continue to cause injury to FTI including but not limited to actual damages, lost profits, consequential damages, loss of value of the ALM business, loss of goodwill, lost profits of the forecasted business that would have been generated by the Solicited Employees had Means not solicited them, and costs of replacement associated with the positions left vacant by the Solicited Employees.

125.     Means also had an actual, undisclosed conflict of interest with FTI beginning as early as his decision to pursue competing employment at Deloitte which would violate Means' FTI Employment Agreement.  Means' conflict of interest continues to this day for so long as he remains in breach of his FTI Employment Agreement is non-compete, non-solicitation, and non-disclosure

obligations.  Means' ongoing conflict of interest also arises under his common law fiduciary duties and duty of loyalty to FTI for so long as he wrongfully uses confidential and proprietary FTI information in the performance of his duties for Deloitte.

126.    Beginning at some point earlier in 2020 until he left FTI's employment on October 31, 2020, Means breached his common law fiduciary duties and duty of loyalty while still employed at FTI.  Among other things, and with Deloitte's active knowledge and assistance, Means accepted Deloitte's offer of competing employment but refused to advise FTI about the identity of his new employer, or the nature and scope of his new employment at Deloitte, for several months until early November 2020.   In September 2020, while still employed at FTI, Means filed a lawsuit against FTI in Texas state court, challenging the lawfulness of his FTI Employment Agreement in several respects, but Means did not disclose the lawsuit to FTI even while he continued to serve as Global Leader of FTI's ALM practice until the end of October 2020.

127.    Means and Deloitte have wrongfully benefited from Means' breach of fiduciary duties and duty of loyalty to FTI, through ongoing use of FTI's Confidential Information, trade secrets, business and marketing methods and collateral, goodwill, and other proprietary information, and by other means as alleged above.

128.    Means has wrongfully benefitted from his use of FTI's Confidential Information by receiving compensation from Deloitte during the period of his breach, generating value and goodwill with current and prospective customers, and obtaining an intact, trained, and experienced group of consultants to work for him at Deloitte, the latter two of which resulted, upon information and belief, in monetary gain to him (and Deloitte).

129.    FTI seeks all available damages for Means' misconduct. Because Means' conduct was willful and malicious, FTI seeks exemplary damages.

### CAUSE OF ACTION 5: MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ("DTSA")

130.    The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

131.    FTI owns and develops Confidential Information, as alleged above, including but not limited to client lists and information, pricing, financial data, marketing or business plans or projections, personnel information, bids, service delivery methods, and information regarding FTI's existing and future business development activities.

132.    FTI's Confidential Information constitutes a trade secret under the DTSA.

133.    FTI's Confidential Information was obtained at significant effort, cost and expense and is highly valuable to FTI. In particular, FTI engages and employs personnel to develop its Confidential Information, its customer base, marketing methodologies and management techniques, its service pricing schedules, and other Confidential Information.

134.    FTI owns all right, title, and interest to its Confidential Information.  In addition, this Confidential Information relates to the management of capital projects or provision of consulting services worldwide – in other words, services which are used in or intended for use in interstate or foreign commerce.

135.    FTI derives a competitive advantage from its Confidential Information, which has independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from its disclosure or us.  In particular, FTI uses the Confidential Information to provide ALM services that are more competitively priced or managed, as compared to those offered by FTI's competitors.  Maintaining the secrecy of the Confidential Information is thus critical to ensuring

that FTI can outperform its competitors by delivering higher-quality, better-priced or managed services.

136.    FTI's Confidential Information would not otherwise have been lawfully known to third party competitors such as Deloitte, without Means' actions alleged herein.

137.    FTI takes numerous reasonable measures to protect the secrecy of its Confidential Information, including technological constraints, contracts, policies, and other measures in line with industry customs and practices.  FTI routinely enters into confidential agreements with persons with access to such information, such as the Employment Agreement with Means.

138.    Means owed a duty not to disclose or use FTI's Confidential Information outside the explicit terms of his Employment Agreement.

139.    Means wrongfully used or disclosed FTI's Confidential Information in the course of his work for Deloitte, or to third parties without authorization or approval from FTI and in violation of Means' duty and Employment Agreement in order to pursue business from customers related to capital projects, including customers that would otherwise seek or utilize FTI's services.

140.    On information and belief, Means acted willfully and with malice in misappropriating FTI's Confidential Information.  FTI is therefore entitled to exemplary damages, costs, and attorneys' fees.

141.    Means' use or disclosure of FTI's Confidential Information has caused and is likely to continue to cause FTI damages including but not limited to actual damages for loss of the trade secret, lost profits, damages for unjust enrichment that is not addressed in actual loss; or, in lieu thereof, a reasonable royalty for the misappropriation.  FTI is entitled to an injunction enjoining actual or threatened misappropriation, and an order requiring any affirmative actions necessary for the protection of the trade secret.

## CAUSE OF ACTION 6: MISAPPROPRIATION UNDER THE TEXAS UNIFORM TRADE SECRETS ACT, Ch. 134A TEX. CIV. PRAC & REM. CODE ("TUTSA")

142.   The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

143.   FTI's Confidential Information, as described herein, including in Paragraphs 47 and 93, is a "trade secret" as defined by TUTSA.

144.   FTI invested considerable time, effort, and financial resources to develop its Confidential Information, as set forth above.

145.   FTI takes reasonable measures under the circumstances to keep the Confidential Information secret, as set forth above.

146.   FTI's Confidential Information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

147.   Means' disclosure or use of FTI's Confidential Information was without FTI's consent and at the time of its disclosure or use Means knew or should have known that he had a duty to keep such information secret or prevent its use.

148.   For the same reasons as alleged for Means' violation of the DTSA, Means has misappropriated FTI's Confidential Information under TUTSA.

149.   FTI seeks the same damages as under the DTSA.

## CAUSE OF ACTION 7: TORTIOUS INTERFERENCE WITH CONTRACT

150.   The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

151.   Like Means, each of Aucamp, LaFleur, and Gowdish were subject to an enforceable employment agreement with FTI.

152.     These contracts were supported by sufficient consideration, including (but not limited to) each Solicited Employee's employment by FTI, substantial compensation thereunder, or access to and provision of FTI's Confidential Information.

153.     Each Solicited Employee Aucamp, LaFleur and Gowdish was subject to contractual non-disclosure and non-solicitation provisions.

154.     Means was fully aware of the existence of these contracts and their associated restrictions.

155.     The limitations of the non-solicitation provisions are reasonable as to time, geographic area, and the scope of the restrained activity.  The provisions do not impose a restraint upon the Solicited Employees that is greater than necessary to protect FTI's interests.

156.     On information and belief, Means and/or others at Deloitte working in active concert with Means, induced some or all of Aucamp, LaFleur, and Gowdish to breach their employment agreements with FTI, including by either violating the customer, client and employee non-solicitation provisions or by violating the non-use and non-disclosure provisions, in exchange for financial incentives in connection with their subsequent employment by Deloitte.  Given the senior management positions held by the Solicited Employees, their disclosure and use of FTI Confidential Information at Deloitte is inevitable and unavoidable.

157.     On information and belief, Means has wrongfully benefitted from the interference with the Solicited Employees' contracts by obtaining an intact, trained, and experienced group of consultants to work for him at Deloitte, resulting, upon information and belief, in monetary gain to him.

158.     Means' conduct was independently tortious and unlawful because it induced the misappropriation of FTI Confidential Information and trade secrets.

159.    Means' conduct was intentional and for the improper and wrongful purposes of obtaining FTI's Confidential Information, interfering with FTI's employee relationships, interfering with FTI's customer relationships, and unlawfully and unfairly competing with FTI.

160.    FTI requires discovery in order to determine the full extent of defendant's conduct and injury resulting from Means' interference with the Solicited Employees' employment agreements including, but not limited to actual damages, lost profits, loss of value of the ALM business commensurate with the forecasted business that would have been generated by customers or employees solicited by the Solicited Employees, as applicable, loss of goodwill, and costs of replacement associated with the positions left vacant by any employees who left their employment with FTI as a result of the Solicited Employees' breaches.

161.    FTI seeks all available damages for Means' misconduct. Because Means' conduct was willful and malicious, FTI seeks exemplary damages.

### CAUSE OF ACTION 8: CIVIL CONSPIRACY

162.    The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

163.    For a period prior to Means formal employment at Deloitte commencing on November 1, 2020, Means and Deloitte were members of a combination of two or more persons, the object of which was to injure FTI's in its business by raiding its AML personnel and misappropriating FTI's Confidential Information, trade secrets and proprietary information related to that business.

164.    Means' and Deloitte's unlawful overt acts committed in furtherance of this conspiracy include one or more of the following: misappropriating FTI's Confidential Information, soliciting the Solicited Employees in violation of the Employment Agreement, using or disclosing

FTI's Confidential Information in breach of Means' Employment Agreement, inducing the Solicited Employees to breach their employment agreements with FTI, using FTI proprietary marketing materials and business strategies in the development of Deloitte's competing capital projects business.

165.     The conspiracy had as its object harming FTI's ALM business and benefiting Deloitte's capital projects consulting business, the misappropriation of FTI's Confidential Information through improper means, and the wrongful interference with FTI's customer relationships, among other wrongful acts.

166.     As a result of the conspiracy, FTI has suffered and will continue to suffer direct and proximate damages including but not limited to actual damages, lost profits, consequential damages, loss of value of the ALM business, and damage to FTI's goodwill, business reputation, confidential information, and customer relationships.

### CAUSE OF ACTION 9: UNFAIR COMPETITION

167.     The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

168.     FTI, as alleged above, invested extensive resources, including money and time, in developing the ALM business line.

169.     Means gained insight into FTI's methodologies and systems for customer acquisition, personnel recruitment and management, and project management in the ALM business space.

170.     Means benefited from this insight, as well as FTI's investment in the ALM business line, through the development of customer goodwill, access to FTI's Confidential Information, and

access to personnel such as the Solicited Employees – who each, in turn, developed customer goodwill and had access to FTI Confidential Information through their employment with FTI.

171.    Now, in competition with FTI, Means and Deloitte are (i) using the customer goodwill Means developed during his employment with FTI, (ii) wrongfully using valuable business information, including FTI's Confidential Information and his knowledge of FTI's methodologies and systems for customer acquisition, personnel recruitment and management, and project management in the ALM business space, and (iii) using the skill and goodwill of former FTI employees, including the Solicited Employees, developed through their time working for FTI. Thereby, Means and Deloitte have an unfair, special advantage because neither will be burdened with the expense incurred by FTI, and FTI is being deprived of its protected trade secrets and proprietary information, employment contracts, and substantial investment in developing the business methodologies and goodwill associated with its own ALM business.

172.    Means' and Deloitte's conduct, as alleged above, has and will cause commercial damage to FTI.

173.    Means' and Deloitte's conduct has directly and proximately caused FTI injuries, including actual damages, lost profits, loss of value of the ALM business, loss of goodwill, and other financial injuries in an amount to be proven at trial, in addition to irreparable injury. These damages are commensurate with the loss of value for FTI's significant commitment to and investment in the ALM business while Means was employed by FTI, loss of value to the Confidential Information used or disclosed by Means, loss of value and goodwill to the current and prospective customer relationships impacted by Means' practices, lost profits of the forecasted business that would have been generated by the Solicited Employees had Means not solicited them, and costs of replacement associated with the positions left vacant by the Solicited Employees.

## THIRD-PARTY COUNTERCLAIM AGAINST DELOITTE

FTI brings the following counterclaim against third party Deloitte, pursuant to Fed. R. Civ. P. 13(h), 19 (Required Joinder) and, in the alternative, Rule 20 (Permissive Joinder), for actual damages, special damages including lost profits, a permanent injunction enjoining Deloitte from continued interference with FTI's asserted legal rights as well as for certain remedial measures, and such other relief to which FTI may be entitled:

### *PARTIES*

174.    The parties are as set forth above in Paragraphs 24-27, which are incorporated herein by reference.

### *JURISDICTION*

175.    The Court's jurisdiction over the subject matter of, and parties to, FTI's third-party counterclaim are as set forth above in Paragraphs 28-29, which are incorporated herein by reference.

### *VENUE*

176.    FTI's venue statement set forth above in Paragraph 30 is incorporated herein by reference.

### *ADDITIONAL THIRD-PARTY COUNTERCLAIM FACTS*

177.    FTI realleges and incorporates by reference each of the factual allegations set forth above in Paragraphs 31 through 89 of its Counterclaim against Mr. Means, as if fully set forth herein.

178.    FTI hired Means in March 2017 as a Senior Managing Director in FTI's Construction Solutions Practice, based in FTI's Houston office.  FTI recruited and hired Means as part of a team to develop an entirely new ALM business line within FTI's Construction Solutions practice.  Means thereafter became the Global Leader of the ALM practice at FTI.

179.    On or before September 15, 2020, Deloitte began recruiting Mr. Means away from his position as Global Leader of FTI's ALM practice, in the hopes he would be able to establish a similar practice at Deloitte using FTI Confidential Information and other proprietary information, business and marketing methods, and goodwill that FTI was developing for its own ALM business. In the course of these recruitment efforts, Deloitte learned about Mr. Means' FTI Employment Agreement, under which Mr. Means agreed not to compete with FTI – nor to solicit FTI employees – within certain limited practice and geographic areas.  Deloitte also learned about Means' ongoing contractual duties to maintain the confidentiality of FTI proprietary information pursuant to his FTI Employment Agreement, and not to use or disclose FTI proprietary or confidential information in the course of his work for another employer.

180.    Aware of the foregoing, Means' FTI Employment Agreement, and Means' possession of FTI Confidential Information and other proprietary information related to FTI's ALM practice – and aware of FTI's success in this newly-developed business line – Deloitte sought to co-opt FTI's ALM practice by hiring away the Global Leader of FTI's practice (Means) and thereby gain access to his knowledge of FTI's Confidential Information and other proprietary information.

181.    With knowledge of the non-compete, non-solicitation, non-disclosure and confidentiality clauses in Means' FTI Employment Agreement, Deloitte hired Means as a "Principal, Capital Assets" in its Transactions and Business Analytics group, based at 1111 Bagby Street in Houston, commencing on or about November 1, 2020.  Both the practice and geographic areas for which Deloitte hired Means fall squarely within the prohibited competition and geographic area of his FTI Employment Agreement.

182.    On September 15, 2020, Means gave notice to FTI of his intent to resign but refused to tell FTI the name or identity of his new employer.  Means' conduct during this period was with Deloitte's actual knowledge and instruction.

183.    In violation of his FTI Employment Agreement and with Deloitte's full knowledge of his FTI Employment Agreement, on November 1, 2020, Means commenced work for Deloitte in a senior management position at Deloitte's Houston office.  As a management level employee of Deloitte, Means has been advising Deloitte clients on capital projects in direct competition with the Asset Life Management practice that he helped develop at FTI over the past four years.  The Deloitte office in which Means now works is less than 50 miles from FTI's Houston offices.

184.    Deloitte has placed Means in a leadership role advising Deloitte clients and colleagues about capital projects and related business processes, enabling technology and performance improvements.  Means' functions and duties are substantially similar to or the same as those he performed during his employment with FTI.  Under the terms of the FTI Employment Agreement, Means' work as a Deloitte employee providing asset management advisory services in Deloitte's Houston office constitutes work for a Competing Business squarely within the Market Area and during the Restricted Period proscribed by the Means/FTI Employment Agreement.

185.    Acting on behalf of Deloitte within the scope of his duties there, and with Deloitte's knowledge and assistance, Means has been and remains in continuing breach of his FTI Employment Agreement.  With Deloitte's assistance, Means has breached his FTI Employment Agreement's non-compete, non-solicitation, and non-disclosure clauses in the manner alleged above.

186.    In at least one instance, Means used his Deloitte email account to send a message to Mr. Aucamp's FTI email address, conveying confidential Deloitte information about

preparation of a bid in response to a University of Chicago request for proposal.  On that same day, Means also launched a marketing email to an as-yet undetermined list of recipients, promoting Deloitte's competing Capital Projects services with FTI proprietary collateral acquired while Means was employed at FTI.  At least one FTI client contacted FTI, pointing out the confusingly similar collateral promoting Deloitte's new Capital Projects service.

187.    On information and belief, including its prior knowledge of the contractual non-compete, non-solicitation and non-disclosure duties Means agreed to in his FTI Employment Agreement, and Deloitte's subsequent ratification of Means' various breaches and tortious conduct, Deloitte is engaged in a course of conduct to actively misappropriate FTI trade secrets, raid its rival of key high-level employees in the Asset Life Management practice, and commit other unfair and unlawful acts to hamper and destroy trade and competition from FTI in that services industry and market.

188.    As a direct and proximate result of Deloitte's unlawful and tortious conduct, FTI has lost business, sales, income, profits, goodwill, business infrastructure and market leadership that FTI invested heavily to acquire and develop over the past four years.

189.    Deloitte's and Means' ongoing conduct threatens FTI with irreparable harm because money damages cannot adequately compensate FTI for theft of its trade secrets, confidential business methods, key personnel and other proprietary information alleged above. There is therefore no adequate remedy at law for Deloitte's and Means' tortious conduct and unfair trade acts.  FTI will suffer irreparable harm in the absence of injunctive relief preventing Deloitte's and Means' ongoing unlawful conduct, and the balance of equities strongly favor FTI by returning the parties to their status quo ante before Deloitte's hiring of Means and other FTI personnel. Injunctive relief should order and direct Deloitte to (a) terminate its unlawful employment of

Means, (b) account for and return all FTI proprietary information in its possession that relate to FTI's ALM practice; (c) disgorge all ill-gotten gains; (d) distribute a written, remedial notice from Deloitte to all clients contacted by Means on behalf of Deloitte's Capital Projects service, (e) observe and maintain a limited ban on further Deloitte recruitment of FTI ALM practice managers for a period of one year, and (f) conduct compliance reporting by an independent auditor to confirm and certify Deloitte's compliance with this Court's order.

## COUNTERCLAIM CAUSES OF ACTION AGAINST DELOITTE

### *CAUSE OF ACTION 1: INDUCING, AIDING and ABETTING BREACH OF FIDUCIARY DUTY*

190.    The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

191.    Throughout his employment at FTI as a Senior Director and as Global Leader of its ALM Practice, Means owed FTI a common law fiduciary duty and duty of loyalty including, but not limited to, a duty to act in FTI's best interests and not take actions on matters for which Means had a conflict of interest with FTI.  Means also has an ongoing duty to maintain and not disclose FTI Confidential Information.  Deloitte knew about Means' duties before hiring him.

192.    At all times relevant, Deloitte knew that Means received FTI Confidential Information as a part of his senior management duties at FTI and knew that the information should not be disclosed to the public, to FTI's competitors, or to any third party.

193.    At all times relevant, Deloitte knew that Means was breaching his fiduciary duties by using or disclosing FTI's Confidential Information to Deloitte, on behalf of Deloitte, or in the course of his work for Deloitte.

194.    Means' and Deloitte's use of FTI Confidential Information has caused and is likely to continue to cause FTI damage including but not limited to actual damages, lost profits,

consequential damages, loss of value of the ALM business, loss of goodwill, lost profits of the forecasted business that would have been generated by the Solicited Employees had Means not solicited them, and costs of replacement associated with the positions left vacant by the Solicited Employees.

195.    At all times relevant, Deloitte knew or should have known that Means had a conflict of interest with FTI beginning as early as his decision to pursue competing employment at Deloitte which would violate Means' FTI Employment Agreement.  Deloitte knew or should have known that Means' conflict of interest continues to this day for so long as he remains in breach of his FTI Employment Agreement's non-compete, non-solicitation, and non-disclosure obligations, and that Means' ongoing conflict of interest also arises under his common law fiduciary duties and duty of loyalty to FTI for so long as he wrongfully uses confidential and proprietary FTI information in the performance of his duties for Deloitte.

196.    With Deloitte's knowledge and assistance, beginning at some point earlier in 2020 until he left FTI's employment on October 31, 2020, Means breached his common law fiduciary duties and duty of loyalty while still employed at FTI.  Among other things, and with Deloitte's active knowledge and assistance, Means accepted Deloitte's offer of competing employment but refused to advise FTI about the identity of his new employer, or the nature and scope of his new employment at Deloitte, for several months until early November 2020.  In September 2020, while still employed at FTI, Means filed a lawsuit against FTI in Texas state court, challenging the lawfulness of his FTI Employment Agreement in several respects, but Means did not disclose the lawsuit to FTI even while he continued to serve as Global Leader of FTI's ALM practice until the end of October 2020.

197.   Means and Deloitte have wrongfully benefited from Means' breach of fiduciary duties and duty of loyalty to FTI, through ongoing use of FTI's Confidential Information, trade secrets, business and marketing methods and collateral, goodwill, and other proprietary information, and by other means as alleged above.

198.   Means and Deloitte have wrongfully benefitted from his use of FTI's Confidential Information by receiving compensation from Deloitte during the period of his breach, generating value and goodwill with current and prospective customers, and obtaining an intact, trained, and experienced group of consultants to work for Deloitte, the latter two of which resulted, upon information and belief, in monetary gain to Deloitte.

199.   FTI seeks all available damages for Deloitte's misconduct. Because Deloitte's conduct was willful and malicious, FTI seeks exemplary damages.

### CAUSE OF ACTION 2: MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ("DTSA")

200.   The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

201.   FTI owns and develops Confidential Information, including but not limited to client lists and information, pricing, financial data, marketing or business plans or projections, personnel information, bids, service delivery methods, and information regarding FTI's existing and future business development activities.

202.   FTI's Confidential Information constitutes a trade secret under the DTSA.

203.   FTI's Confidential Information was obtained at significant effort, cost and expense and is highly valuable to FTI. In particular, FTI engages and employs personnel to develop its Confidential Information, its customer base, marketing methodologies and management techniques, its service pricing schedules, and other Confidential Information.

204.     FTI owns all right, title, and interest to its Confidential Information.  In addition, this Confidential Information relates to the management of capital projects or provision of consulting services worldwide – in other words, services which are used in or intended for use in interstate or foreign commerce.

205.     FTI derives a competitive advantage from its Confidential Information, which has independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from its disclosure or us.  In particular, FTI uses the Confidential Information to provide ALM services that are more competitively priced or managed, as compared to those offered by FTI's competitors.  Maintaining the secrecy of the Confidential Information is thus critical to ensuring that FTI can outperform its competitors by delivering higher-quality, better-priced or managed services.

206.     FTI's Confidential Information would not otherwise have been lawfully known to third party competitors such as Deloitte, without Means' and Deloitte's actions alleged herein.

207.     FTI takes numerous reasonable measures to protect the secrecy of its Confidential Information, including technological constraints, contracts, policies, and other measures in line with industry customs and practices.  FTI routinely enters into confidential agreements with persons with access to such information, such as the Employment Agreement with Means and the other FTI employees who Means and Deloitte recruited away from FTI.

208.     Means owes FTI a continuing duty not to disclose or use FTI Confidential Information except as permitted by the explicit terms of the Employment Agreement.

209.     With Deloitte's knowledge and consent, Means wrongfully used or disclosed FTI's Confidential Information in the course of his work for Deloitte, or to third parties without

authorization or approval from FTI and in violation of Means' duty and Employment Agreement in order to pursue business from customers related to capital projects, including customers that would otherwise seek or utilize FTI's services.

210.     On information and belief, Means and Deloitte acted willfully and with malice in misappropriating FTI's Confidential Information.  FTI is therefore entitled to exemplary damages, costs, and attorneys' fees.

211.     Deloitte's and Means' use or disclosure of FTI's Confidential Information has caused and is likely to continue to cause FTI damages including but not limited to actual damages for loss of the trade secret, lost profits, damages for unjust enrichment that is not addressed in actual loss; or, in lieu thereof, a reasonable royalty for the misappropriation.  FTI is entitled to an injunction enjoining actual or threatened misappropriation, and an order requiring any affirmative actions necessary for the protection of the trade secret.

### CAUSE OF ACTION 3: MISAPPROPRIATION UNDER THE TEXAS UNIFORM TRADE SECRETS ACT, Ch. 134A TEX. CIV. PRAC & REM. CODE ("TUTSA")

212.     The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

213.     FTI's Confidential Information, as described herein, is a "trade secret" as defined by TUTSA.

214.     FTI invested considerable time, effort, and financial resources to develop its Confidential Information, as set forth above.

215.     FTI takes reasonable measures under the circumstances to keep the Confidential Information secret, as set forth above.

216.    FTI's Confidential Information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

217.    Means' disclosure or use of FTI's Confidential Information was without FTI's consent and at the time of its disclosure or use Means knew or should have known that he had a duty to keep such information secret or prevent its use.

218.    For the same reasons as alleged for Deloitte's violation of the DTSA, Deloitte has misappropriated FTI's Confidential Information under TUTSA.

219.    FTI seeks the same damages as under the DTSA.

### *CAUSE OF ACTION 4: TORTIOUS INTERFERENCE WITH CONTRACT*

220.    The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

221.    Like Means, each of Aucamp, LaFleur, and Gowdish were subject to an enforceable employment agreement with FTI.  At all times relevant, Deloitte was aware of the employment agreements between FTI and each of Means, Aucamp, LaFleur and Gowdish, together with the agreements' associated restrictions.

222.    FTI's contracts were supported by sufficient consideration, including but not limited to each Solicited Employee's employment by FTI, substantial compensation thereunder, or access to and provision of FTI's Confidential Information.

223.    Each employment agreement contained non-disclosure and non-solicitation provisions.

224.    The limitations of the non-compete, non-solicitation and non-disclosure provisions of the asserted FTI employment agreements are reasonable as to time, geographic area, and scope

of the restrained activity.  The provisions do not impose a restraint upon the Solicited Employees that is greater than necessary to protect FTI's interests.

225.    With knowledge of the foregoing, Deloitte induced Means and the Solicited Employees to breach various provisions of their respective employment agreements with FTI by, among other things, violating the agreements' non-solicitation and non-disclosure provisions and, additionally in the case of Means, his non-compete clause.  The breaches at issue were undertaken in exchange for financial incentives offered and paid by Deloitte to the breaching parties.

226.    On information and belief, Deloitte has wrongfully benefitted from the interference with the Solicited Employees' contracts by obtaining an intact, trained and experienced group of consultants to work for Means at Deloitte, resulting, upon information and belief, in monetary gain to him.

227.    The conduct of Deloitte and Means was tortious and unlawful because it induced the misappropriation of FTI Confidential Information and trade secrets.

228.    Deloitte's conduct was intentional and for the improper and wrongful purposes of obtaining FTI's Confidential Information, interfering with FTI's employee relationships, interfering with FTI's customer relationships, and unlawfully and unfairly competing with FTI.

229.    FTI requires discovery in order to determine the extent of damages resulting from Means' and Deloitte's interference with the Solicited Employees' employment agreements including, but not limited to actual damages, lost profits, loss of value of the ALM business commensurate with the forecasted business that would have been generated by customers or employees solicited by the Solicited Employees, as applicable, loss of goodwill, and costs of replacement associated with the positions left vacant by any employees who left their employment with FTI as a result of the Solicited Employees' breaches.

230.     FTI seeks all available damages for Deloitte's misconduct. Because such conduct was willful and malicious, FTI seeks exemplary damages.

### CAUSE OF ACTION 5: CIVIL CONSPIRACY

231.     The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

232.     From some point earlier in 2020 until Means joined Deloitte in his senior management position there, Means and Deloitte were members of a combination of two or more persons, the object of which was to injure FTI's in its business by raiding its AML personnel and misappropriating FTI's trade secrets and proprietary information related to that business.

233.     Means' and Deloitte's unlawful overt acts committed in furtherance of this conspiracy include one or more of the following: misappropriating FTI's Confidential Information, soliciting the Solicited Employees in violation of the Employment Agreement, using or disclosing FTI's Confidential Information in breach of Means' Employment Agreement, inducing the Solicited Employees to breach their employment agreements with FTI, using FTI proprietary marketing materials and business strategies in the development of Deloitte's competing capital projects business.

234.     The conspiracy has as its object harming FTI's ALM business and benefiting Deloitte's capital projects consulting business, the misappropriation of FTI's Confidential Information through improper means, and the wrongful interference with FTI's customer relationships, among other wrongful acts.

235.     As a result of the conspiracy, FTI has suffered and will continue to suffer direct and proximate damages including but not limited to actual damages, lost profits, consequential

damages, loss of value of the ALM business, and damage to FTI's goodwill, business reputation, confidential information, and customer relationships.

## CAUSE OF ACTION 6: UNFAIR COMPETITION

236.    The facts and allegations of the preceding paragraphs are re-alleged and adopted by reference herein.

237.    FTI, as alleged above, invested extensive resources, including money and time, in developing the ALM business line.

238.    At all times relevant, Deloitte was aware that Means gained insight into FTI's methodologies and systems for customer acquisition, personnel recruitment and management, and project management in the ALM business space.  Means and, in turn his new employer Deloitte, have benefited and are benefiting from this insight, as well as FTI's investment in the ALM business line, through the development of customer goodwill, access to FTI's Confidential Information, and access to personnel such as the Solicited Employees who each enjoyed customer goodwill and had access to FTI Confidential Information through their employment with FTI.

239.    In direct competition with FTI, Means and Deloitte are now (i) using the customer goodwill Means developed during his employment with FTI, (ii) wrongfully using valuable business information, including FTI's Confidential Information and his knowledge of FTI's methodologies and systems for customer acquisition, personnel recruitment and management, and project management in the ALM business space, (iii) using the skill and goodwill of former FTI employees, including the Solicited Employees, developed through their time working for FTI; (iv) interfering with FTI employment agreements with other directors and managers within FTI's ALM practice.  Thereby, Means and Deloitte have an unfair, special advantage because neither will be burdened with the expense incurred by FTI, and FTI is being deprived of its protected trade secrets

and proprietary information, employment contracts, and substantial investment in developing the business methodologies and goodwill associated with its own ALM business.

240. Means' and Deloitte's conduct has and will cause commercial damage to FTI. Means' and Deloitte's conduct has directly and proximately caused FTI injuries, including actual damages, lost profits, loss of value of the ALM business, loss of goodwill, and other financial injuries in an amount to be proven at trial, in addition to irreparable injury. These damages include the loss of value for FTI's significant commitment to and investment in the ALM business while Means was employed by FTI, loss of value to the Confidential Information used or disclosed by Means and other former FTI employees, loss of value and goodwill to the current and prospective customer relationships impacted by Deloitte's Means' practices, lost profits of the forecasted business that would have been generated by the Solicited Employees had Deloitte not solicited them with knowledge of their existing contracts  and other duties to FTI, and costs of replacement associated with the positions left vacant by the Solicited Employees.

## PRAYER FOR RELIEF AGAINST MEANS

WHEREFORE, Defendants and Counter-Plaintiffs FTI prays that Means takes nothing by his suit, that his action be dismissed, and judgment entered int FTI's favor, and that FTI be awarded costs and any and all such relief, general or special, at law or in equity, to which FTI may show itself justly entitled.  Further, FTI respectfully requests the following relief:

(i) A judgment that Means is continuing breach of his Employment Agreement by working as an employee for and in a Competing Business;

(ii) A judgment that Means is in continuing breach of his Employment Agreement by soliciting FTI employees to work for a Competing Business;

(iii) A judgment that Means is in continuing breach of his FTI Employment Agreement by disclosing Confidential Information to a Competing Business;

(iv) A judgment that Means is in breach of his fiduciary duties to FTI;

(v)     A judgment that Means is violating the DTSA by misappropriating FTI's Confidential Information;

(vi)    A judgment that Means is violating the TUTSA by misappropriating FTI's Confidential Information;

(vii)   A judgment that Counter-Defendant Means tortiously interfered FTI's contracts with Aucamp, LaFleur, Gowdish and other AML employees by inducing some or all of them to violate their respective non-compete, non-solicitation and/or non-disclosure provisions within those enforceable contracts;

(viii)  A judgment that Counter-Defendant Means engaged in an unlawful civil conspiracy with Deloitte and/or others by misappropriating FTI's Confidential Information, soliciting the Solicited Employees in violation of the Employment Agreement, using or disclosing FTI's Confidential Information in breach of Means' Employment Agreement, inducing the Solicited Employees to breach their employment agreements with FTI, using FTI proprietary marketing materials and business strategies in the development of Deloitte's competing capital projects business;

(ix)    A judgment that Counter-Defendant Means engaged in or committed unfair business practices;

(x)     An award to FTI for actual damages, lost profits, loss of goodwill or business value; consequential damages, exemplary damages; attorneys' fees; pre- and post-judgment interest; and such and other further relief to which FTI may justly be entitled;

(xi)    A permanent injunction enjoining Means from further violation of the Employment Agreement and extending the Restricted Period by an amount of time equal to the period in which Means violated the covenants of the Employment Agreement;

(xii)   A judgment ordering Means to return and purge all documents and electronically stored information containing FTI's Confidential Information;

(xiii)  An award to FTI for its additional costs and expenses incurred in pursuit of this Counterclaim and its defense of the declaratory judgment action;

(xiv)   Exemplary or punitive damages; and

(xiii)  All such other relief as the Court deems just and proper, in law or equity.

## PRAYER FOR RELIEF AGAINST DELOITTE

WHEREFORE, Counter-Plaintiffs FTI pray for the following relief from Counter-

Defendant Deloitte:

(i)    A judgment that Deloitte induced, aided, and abet Mean's breach of his fiduciary duty to FTI;

(ii)    A judgment that Deloitte has tortiously interfered with FTI's contracts with Means, Aucamp, LaFleur, Gowdish and other AML employees by inducing some or all of them to violate their respective non-compete, non-solicitation and/or non-disclosure provisions within those enforceable contracts;

(iii)    A judgment that Deloitte is violating of the DTSA by misappropriating FTI's Confidential Information;

(iv)    A judgment that Deloitte is violating of the TUTSA by misappropriating FTI's Confidential Information;

(v)    A judgment that Deloitte tortiously interfered FTI's contracts with Means, Aucamp, LaFleur, Gowdish and other any other FTI AML employees by inducing some or all of them to violate their respective non-compete, non-solicitation and/or non-disclosure provisions within those enforceable contracts;

(vi)    A judgment that Deloitte engaged in an unlawful civil conspiracy with Means and/or others by misappropriating FTI's Confidential Information, soliciting the Solicited Employees in violation of the Employment Agreement, using or disclosing FTI's Confidential Information in breach of Means' Employment Agreement, inducing the Solicited Employees to breach their employment agreements with FTI, using FTI proprietary marketing materials and business strategies in the development of Deloitte's competing capital projects business;

(vii)    A judgment that Deloitte engaged in or committed unfair business practices;

(viii)    An award to FTI for actual damages; lost profits; loss of goodwill or business value; exemplary damages; attorneys' fees; pre- and post-judgment interest; and such other and further relief to which FTI may justly be entitled;

(ix)    A permanent injunction enjoining Deloitte from further tortious conduct alleged and for remedial measures necessary to restore FTI's *status quo ante*, together with compliance reporting conducted by an independent auditor;

(ix)    A judgment ordering Deloitte to return and purge all documents and electronically stored information containing FTI's Confidential Information;

(x)    An award to FTI for its additional costs and expenses incurred in pursuit of this third-party counterclaim;

(xi)     Exemplary or punitive damages; and

(xv)     All such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Defendants and Counter-Plaintiffs FTI hereby demand a jury trial.


DATED:  April 1, 2021                    Respectfully Submitted,

                                         SPROTT NEWSOM QUATTLEBAUM &
                                         MESSENGER, P.C.

                                    BY: */s/ Kandy E. Messenger*
                                         Kandy E. Messenger
                                         State Bar No. 24053360
                                         Fed. ID. No.: 638777
                                         messenger@sprottnewsom.com
                                         2211 Norfolk, Suite 1150
                                         Houston, Texas 77098
                                         Telephone: (713) 523-8338
                                         Facsimile: (713) 523-9442

                                         and

                                         Thomas E. Gilbertsen (*pro hac vice* pending)
                                         tgilbertsen@dueffertlaw.com
                                         Paul K. Dueffert (*pro hac vice* pending)
                                         pdueffert@dueffertlaw.com
                                         DUEFFERT GILBERTSEN PLLC
                                         1325 K Street N.W., Suite 500
                                         Washington, D.C.  20005
                                         (202) 552-7410

                                         **ATTORNEYS FOR DEFENDANTS AND
                                         COUNTER-PLAINTIFFS FTI, LLC AND FTI
                                         CONSULTING, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this **1st day of April 2021**, a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF System and was automatically copied to all counsel of record through the Court's electronic filing system, including counsel for Plaintiff and/or Counter-Defendant Means.

*Attorney for Plaintiff and/or Counter-Defendant Means*
Gregg M. Rosenberg
Rosenberg | Sprovach
3518 Travis, Suite 200
Houston, Texas 77002


*/s/ Kandy E. Messenger*
Kandy E. Messenger